All room support is now in session. You may be seated. The clerk will call the next case. Case number 314-0407. People of the State of Illinois. Appellee by Gary Genetovac v. D'Angelo Gulley. Appellant by Mark Fisher. Mr. Fisher, you may proceed. Thank you, Your Honor. Good afternoon, Your Honors. May it please the court and counsel, I'm representing the defendant in this case, D'Angelo Gulley. Mr. Gulley was convicted in a jury trial of armed robbery and two counts of home invasion. Specifically, the jury found that on September 4, 2013, the defendant was one of two individuals who unlawfully entered the residence of Jeremy Miles, threatened, used force against Jeremy, beat Jeremy, causing him injury, and also, while armed with a gun, took United States currency from him. Mr. Gulley was sentenced to two concurrent terms of 36 and 24 years imprisonment. The three issues are raised on appeal. The first issue, the defendant maintains that the trial judge abused his discretion when he denied defense counsel's request for a short extension of the trial to call an occurrence witness who purportedly would have testified that the defendant was not one of the intruders. The defendant submits that that ruling by the judge denied the defendant a fair trial because the evidence in this case was closely balanced. The only evidence against the defendant was eyewitness identification testimony. Mr. Gulley, therefore, asks this court in issue one for a reversal and a remand for a new trial. He also seeks a new trial in issue two because he received ineffective assistance of trial counsel where counsel failed to ask the judge to appoint an expert to testify about the fallibility of eyewitness identification and about factors that apply in this case, which tend to undermine the reliability of eyewitness identification. As an alternative in issue three, Mr. Gulley asks your honors to either reduce his sentences or to remand the cause for resentencing because the judge considered improper factors in aggravation. In argument today, I intend to focus on the first two issues, the new trial issues. Of course, if your honors have questions about issue three, the sentencing issue, I'd be happy to address those as well. Jeremy Miles testified that he shared an apartment with two women, one of whom was named Janika Mills. On the evening of September 4, 2013, Jeremy and Janika left the apartment, they purchased cannabis, and then they returned to the apartment where they were confronted by two partially masked individuals holding guns. They demanded money from Jeremy, they threatened him, they beat him, they ultimately obtained money from him. His mother Janice Miles also testified that she lived in the apartment next door. She heard a commotion coming from her son's apartment, she entered, saw two masked individuals holding guns. Jeremy and Janice identified the defendant as one of the intruders. The defendant also testified at trial, denied having anything to do with these crimes, claimed that on the night in question he was at a baby shower with the mother of his child, his sister, and others. The defense also called his sister and the mother of his child, and they corroborated the alibi defense. Now, during the lunch recess on the first day of the jury trial, defense counsel told the judge and the prosecutor that she had intended to call Janika Mills, the victim's roommate, as a witness at trial. Because prior to trial, Janika had given an affidavit to the state's attorney saying that the defendant was not one of the two intruders. However, she had heard from her office that earlier that day, on the first day of the jury trial, Janika had left a message that she was going to work and was not going to come in and testify. The counsel said she had subpoenaed the witness, but rather than have her arrested and dragged to court, she wanted the opportunity to talk to her that evening, to try and convince her to come in willingly. And so she asked the judge to hold closing arguments until the second day of trial, in the event that all of the other witnesses completed their testimony on the first day of trial. The judge at that point said he was not inclined to delay the trial, but he would kind of take a wait-and-see approach, see how much evidence was presented on that first day. Later on the first day, after defense rested its case, defense counsel renewed her request. The judge denied it. He said he did not believe that Janika would come in and save the day for the defense, and he directed the attorneys to go right into closing arguments. So, in fact, that is what happened, and the jury never read testimony from Janika in this case. The defendant submits that that ruling by the judge was an abuse of discretion that denied him a fair trial. Now, as I noted, the evidence here was very closely balanced. There was no physical evidence against the defendant. There were no incriminating statements made by the defendant. In fact, he told police that he had nothing to do with these crimes. The only evidence against the defendant was eyewitness identification from two occurrence witnesses. It was therefore important for the defense to have the opportunity to bring in a third occurrence witness who, according to her affidavit to the state's attorney's office, would have said that this man was not one of the two intruders. Now, the judge said, well, he didn't think Janika would come in and save the day. There was no way for the judge to be able to prejudge her testimony or prejudge her credibility. This was a very serious case, class X offenses, and the defendant received lengthy sentences. In addition, the state never objected to the request. And finally, I think the thing that is most ironic here is that, as it turned out, this case did go into a second day. Earlier, on the first day of trial, one of the jurors had told the judge that he had a commitment and had to leave the courthouse by 5 o'clock. So the closing arguments concluded at about 4.30 in the afternoon on the first day. At 5 o'clock, the judge recessed the trial because this juror had to leave. There was no verdict yet, so he directed the jury to come back the second day. The jury came back the second day, deliberated, and ultimately reached a verdict. So it wouldn't have delayed anything under the circumstances that the judge would have just held the closing arguments for the second day. In addition, counsel was not asking for an open-ended extension. This would not have been a wild goose chase because she had subpoenaed the witness, so presumably knew where she lived. Under all of these circumstances, the defendant submits there was absolutely no reason for the judge not to accede to counsel's request. Because he did not do so, defendant submits that deprived the defendant of his constitutional right to fully and fairly present his defense to the jury. As a result, he maintains he did not receive a fair trial, and he respectfully asks your honors to remand the cause for a new trial. He also seeks the same relief in Issue 2, and I know that one of my colleagues argued a very similar issue yesterday before this court. I believe he said that your honors, Justice O'Brien and Justice Carter were on the panel, and so I'll apologize ahead of time for covering some of the same ground that he probably covered yesterday. As I mentioned before, the only evidence against the defendant in this case was eyewitness identification. In 2012, Justice Sonia Sotomayor of the United States Supreme Court wrote that the empirical evidence demonstrates that eyewitness identification is the single greatest cause of wrongful convictions in this country. And you can find similar statements by commentators and by other courts as well. Now, in 1990, the Illinois Supreme Court decided a case called People v. Enos, in which it held that the trial judge did not abuse his discretion in refusing to allow the defense to call an expert to testify about the reliability, or in some cases unreliability, of eyewitness identification. However, in 2015, in the case called People v. Lermo, Illinois Supreme Court disavowed its decision in Enos. Now, in doing so, it talked about the research in this area. And it said that the research was in its infancy back in 1990 when Enos was decided. But that in the ensuing years, there had been a dramatic shift in the legal landscape. That the ensuing decades of research had resulted in expert testimony about the reliability of identification, eyewitness identification, moving from novel and uncertain to settled and widely accepted. Furthermore, the court recognized that especially in a case like the case of Barr, where there is no physical evidence against the defendant, it's important for the defense to be able to present this type of expert testimony. It's also important, the court Lerma noted, where certain factors applied. Now, interestingly, in Enos, the court stated that those factors did not apply. And so it felt that the expert testimony in that case would have helped the prior fact very little. But some of those factors do, in fact, apply in the case of Barr. For example, a situation where the witness is, in fact, the victim of a crime, as opposed to just an observer on the street. A case, therefore, where the witness is under stress at the time that he or she views the assailant. A case where the individual is threatened with a weapon. And a case where one or more of the defendants are masked or disguised. All of those factors, the research indicates, tend to undermine the reliability of eyewitness identification. And those factors existed here. Now, when defense counsel argued the case to the jury, counsel, of course, talked about the other side of things. But she then asked the jury, if the defendant and his witnesses are telling the truth, how is it that Jeremy and Janice Miles would testify that the defendant was one of the intruders? And she basically said to the jury, I have no answer to that question. This is a credibility case that you have to decide, and I submit to your honors, that that basically communicated the idea to the jury that somebody must be lying here. It's either the defendant and his witnesses, or it's the prosecution and witnesses. And counsel presented expert witness testimony about the factors that tend to undercut eyewitness identification. She could have argued to the jury, look, you don't have to find that anybody was lying here. You can find that the defendant and his witnesses were telling the truth. They were at the baby shower. They were not at the Miles residence. But Jeremy and Janice made a good-faith mistaken misidentification. And if counsel had presented that evidence and had made that argument, I would submit it would have strongly bolstered the alibi defense, and it would have created a very good chance that the jury here would have voted to acquit. Now, one of the interesting things discussed in Lerman and discussed in some of these other cases is that most individuals in our society believe that eyewitness identification is reliable. And, therefore, it's important to call an expert to explain away those misconceptions, to educate the jury. That was what was missing here. Unfortunately, counsel tried this case as if it was the early 1990s instead of 2014. Thank you. As if the decades of research referenced by the court in Lerma did not exist. Now, I acknowledge to the court that Lerma was decided in 2015, which was a year after the defendant was tried. But I've cited cases in the briefs from the Illinois Appellate Court, from other jurisdictions, and commentators as well, truances and whatnot, talking about the same things prior to the trial in this case. And the quote, I read, Your Honors, earlier from Justice Sotomayor, that's from 2012, two years prior to the Lerma decision. So this was a progression over time. I would submit that counsel should have known about that. Again, the evidence involved different facts, and counsel should have realized that as well. And so, therefore, for these reasons, either alternatively to or in addition to the different reasons set forth in Issue 1, Mr. Kelly respectfully asks this court to reverse and to remand for a new trial. Thank you. Thank you, Your Honors. Mr. Kinnevik. May it please the court, counsel. With respect to the denial of a motion to continue, actually with respect to both issues that are raised, with respect to both issues have not been properly preserved. The defendant recognizes the forfeiture issue with respect to the first one, and, of course, the second one, we talk about the ineffective assistance of counsel. That issue, obviously, had never been raised both in the first time on appeal. I simply point this out simply because under the first issue, we're trying to determine plain error. And one of the arguments the defendant makes in that is the fact that it was ineffective assistance for counsel not to have properly preserved the issue. And the second issue, obviously, raising it for the first time on appeal, he basically eschews any kind of reliance upon plain error, once again, arguing ineffective assistance. My point is simply this. Regardless, the substance of both issues are going to be looked at by this court. So what I'm saying is with respect to plain error, you have to first determine whether there was error. With respect to ineffective assistance, you have to determine whether or not counsel's failure to do something was deficient performance. What you do is you look at the underlying issue. So irrespective of how this court looks at it, we're going to be looking at the substance of these issues to determine whether or not error had occurred in this case. So with respect to the first issue, if this court finds that there is no plain error, then it can't be ineffective assistance of counsel because you're still going to be looking at the same substance issue no matter what. With respect to the denial of the motion to continue, Mills wasn't a current witness. She was present at the scene. She was present at the house. Now, when she called, okay, when she called and spoke with defense, left a message with defense counsel, what she said was she not only said that she wouldn't be in court ignoring the subpoena, and she not only said that she was going to have to go to work, but she also said, I don't want anything to do with this case. Now, Mills supposedly had gone with the victim on the day of the occurrence to go buy cannabis. Came back. After the incident, she was described along with the other individual that was there, the other female that was there. They were sitting on the couch acting as though nothing had happened. They weren't upset, weren't concerned, just playing on their phones, doing their thing, texting people, whatever, and didn't care. So what we have is we have an occurrence witness who seemingly had no, essentially had no effect on her whatsoever. But aside from that, she said she didn't want anything to do with this case. As well as the fact that it was also determined that what she said that she had read in the paper, she had read and she had found out that this person was charged with this crime, She did this private investigation, and she determined that he was not the right guy. Yet, coming to find out that her picture is on the defendant's Facebook page. They know each other. They're friends. So she either knew him or knew of him or was his friend. Doesn't her affidavit say she looked him up? She looked him up, but that doesn't put her picture on his website, on his Facebook. Well, if you're going to look somebody up on Facebook, in order to be able to look at all their photos, you have to be friends with them, usually. No, I don't know that much about Facebook. I don't have a Facebook account. So I don't know how Facebook really, honestly works. But from my understanding, what has to happen is if she has an account on Facebook, you can get so far in with somebody. You can go so far and look and check them out and see their picture if they are not totally private. But her picture was on his Facebook account as a friend. That is not just something that puts her there because she looked it up. She has to be accepted by him as a friend. That's my understanding of Facebook. Honestly, that's my limited knowledge, all I know. And so the fact is she was a friend of his on Facebook. That indicates she had a prior, some kind of a prior relationship, some kind of a prior something with this individual. Now, all of a sudden, she comes up with the affidavit saying it's not him. But now, all of a sudden, she's willing to take and face contempt. She's willing to take and ignore a subpoena. And not just because she has to work, she goes, I don't want anything to do with this case. So the reason why these facts are important is not so much because it justifies what she did or we're really concerned about what she did or why she did it, but the trial judge's ruling. And with the trial judge, when we review this, we have to look at whether the defendant, a trial judge will look, did the defendant act diligently? And then the trial judge will take and say, well, is the witness's testimony material and might it affect the verdict, and was the defendant prejudiced? And what the courts have also said with respect to this, it is not an abuse of discretion if there is no reasonable probability or expectation exists that the witness will be available in the foreseeable future or when the missing witness's testimony is merely cumulative. Now, in this case, the defendant presented what kind of a defense? Alibi. I wasn't there. Now, would Mill's testimony, would that prove anything above and beyond what I believe it was Johnson and Tara Forrest had testified to? They testified he wasn't there. The defendant testified he wasn't there. Mill's testimony would be what? Defendant wasn't there. Not much different than what was presented to the jury. None of those were occurrence witnesses. None of them were present at the time. So, I mean, her testimony is a little bit different. I'm not saying that they were with me and we were giving this baby shower, but her testimony would be, I was sitting on that couch when this person came in, and the person that came in is not this person that's charged. Which means that what? Defendant wasn't there. And basically, two people who saw the defendant at a different location, who basically said he wasn't there, whether they're an occurrence witness or not, they were at some place else saying he was with us at that time. It's exactly, in effect, it's exactly the same testimony. It's exactly the same evidence. Whether you label it an occurrence witness or whether you label it as an alibi witness, the testimony is what the testimony is, and it's identical. As well as the fact that, in this case, the trial judge was not certain that she would ever reasonably in the foreseeable future appear. And so, in this particular situation, what the trial judge did, and really as he did, was making, in his estimation, a common sense approach to what was presented to him in view of the testimony and in view of the fact that, yes, to a large degree, he did make a credibility determination, credibility determination in the sense of weighing what she had said and the effect of what she said versus the fact that she made this, the trial judge phrased it as though she had indicated that she really didn't know this individual. That she had to take a look him up. In other words, the individual that was listed in the paper. I'm assuming that's how she found out because that's how I interpreted her affidavit. That she had to look to take a finder's note. Now, mind you, she gets this guy, so she's got the guy in the newspaper. She looks him up on Facebook and she says, he's not the guy. And yet, they're friends. This led the trial judge to take in question, first, her idea that she didn't know. Because the tenor of what she said is, I had to look this guy up. In other words, the name was in the paper. I couldn't recognize him. I had to look him up. But yet, because her picture's on there, it's kind of like it's a contradiction. If she was a friend of him. Well, I mean, it could be because there's a lot of, I mean, we don't know that his picture appears on his profile because a lot of people's photo doesn't appear. It might be a Cubs insignia or it might be somebody for president or whatever. So then, in order to actually see a depiction of that individual, you have to try to be friends with them. She could have maybe did something later. I mean, all of those things are sort of just pure speculation. Except for one thing. The prosecutor is the one who found them. I don't think the prosecutor was, quote-unquote, friends with the defendant. The prosecutor was able to view the defendant's account. Because the trial judge asked the prosecutor in this case, Mr. Prosecutor, is this the proof? He can see his account. He can see who his friends are. But he doesn't say, and his picture was there. So that's how, you know, she didn't need to be friends with him. I didn't see any of that. But her picture was on his account as a friend. That's the point. But the point I'm making to you is, that doesn't mean that she could have seen his picture without being friends with him. She could see his name, or any name he decides to use. But if he doesn't have his picture on his profile, and he doesn't let everybody in the universe see everything on his page, you've got to make a friend request, have that request be accepted. Then you can look at everything in there. So the prosecutor could get on, you know, find this individual with this name, and see who that person's friends are. But that doesn't mean that his picture was there so that she didn't have to, you know, she wanted to find out what he looked like. She might have had to have become friends with him. Even if she has her picture. I could put your picture as my profile. Okay. Unless I don't. I think you're saying two different things. What you're doing is you're saying one thing for the defendant and Mills, and you're saying something else for the prosecutor. No, no. The prosecutor could type his name in the search. And see what? His account could come up, and it may or may not have a photo of him. But anybody that's his friend is going to show, if their profile is a picture of themselves, it's going to show the depiction of who his friends are without you being able to get any other information. And that would be the same thing with Mills. If you're saying the prosecutor could take and do that, then Mills could have done that without having to be a friend. But not of his photo. That's the case, and the prosecutor couldn't have done it either. But he would see his name, and he never said, I saw his picture, so I know it's him. No, he thinks that the prosecutor is the one that said they found Mills' picture as a friend on the defendant's Facebook account. How would the prosecutor be able to do that? If they brought up his name, and it would say, you know, it has some people put more information than others, that is just tight, they could determine, this is the same individual that we have charged with this crime without having his picture. I know it doesn't seem to make sense. Without having his picture? Without having his picture. How would they know if it's the same guy, and it's not somebody else that's the same person, or with the same name? Well, and there might be 20, and there might be one that says Peoria, one that says Chicago, so you start clicking on them. And then the process is like, okay, maybe the prosecutor knows some of his associates, or other people, and you start looking and saying, this is the same person, this is who I'm looking for, because I see who his friends are, and these are people from Peoria, or people I know, so I'm thinking that's probably who this person is. Okay, now stop there. If that's the case, Mills could have done the same thing. But she couldn't have seen his picture. She could have surmised, hey, yeah, I think this is him. I don't know, to be quite honest with you, I don't know, seriously, how Facebook accounts go, and I don't know, because a lot of times, when they're sitting private, and they don't show a picture, generally speaking, you can't get any other information. You get no information unless you join Facebook, and or unless you ask to be friends with them. And then on that, if I am friends with someone, and their profile picture is just insignia for the Chicago Cubs, it's going to say Jane Doe, and she only shares information with her friends. These are some of her friends, and my picture's going to show them. See, I don't think, I don't think that the prosecutor could have gotten any more information above and beyond what Mills got without being friends with the defendant. And if that's the case, and if the prosecution was able to find this, just by going on and typing it in, I would venture to say that Mills could have done the same thing without being asked to be a friend. And this would have been some of the testimony that would have been great to have heard, and had her been impeached. But my question to you is, because this woman had been subpoenaed, the problem that, she said, I want a continuance to try and get her to come in. Maybe she said, hey, I got a witness here under subpoena, and I want them here. Could the judge, I mean, could he just say, no, we're not doing that, or would they have been required to stop this trial to get that? And I'm asking, how does that, I mean, how does that work? Is it a bigger problem because she didn't want to, or the defense attorney didn't want to force this person in, or how does it work? Defense counsel asked for a brief continuance for the next day. I have this feeling, because of the fact that Mills was defying the subpoena, was saying that she was going to go to work instead, as well as the fact that, and to me the phrase is very telling, I don't want anything to do with this case. My conjecture is, counsel, if she hauled the witness in, was afraid that the witness, who was already reluctant to testify, might very well not testify in accordance with what counsel thought. So what counsel, I think, wanted to do is, counsel wanted to kind of cajole the witness, wanted to kind of get the witness to come in. The trial judge even tried getting a hold of the witness from the bench at the time of all this, and could not get a hold of her. So I think that counsel may very well have thought, rather than really push the witness further away or whatever, was thinking, if I can take and have time, if I can take and talk to the witness, I might be able to talk them in, and have them come in, et cetera, et cetera. That is just... And I think that's what the thought was, and that's the reason why, rather than have the sheriff go out and find her and haul her in, I think that was what the idea was. Now, would that have changed what the trial judge decided to do or not to do? I don't know. And I said I don't know, is because the trial judge postponed it, and because of the fact that the trial judge delayed his decision to see how things panned out. Two minutes, counsel. Thank you. So I think that in this particular case, when you look at the totality of the circumstances, the trial judge exercised his discretion, didn't want to take and stop the trial, the defendant had the alibi, witnesses found that the testimony, the substance of Mill's testimony would be no different than that of the alibi witnesses, that he wasn't there, which is what their testimony was, because he wasn't there because he was over here. But as a result of that, and because of the fact that there was no guarantee that they were going to really get her in, decided to take and deny the motion to continue for that purpose. With respect to the eyewitness, let me just say this, the eyewitness identification. Indeed, the law has kind of evolved, but when you take a look at Lerma, Lerma involved two eyewitnesses. They were sitting on a front porch when somebody walked up with a black hoodie, the hoodie was down supposedly, pulled out a gun, fire, fire, fire, okay? One of the eyewitnesses to firing was shot, was hit, dragged into the house by the other eyewitness. Basically, a third person came down, the person who was shot said, the defendant shot me. The victim that was shot then died. The other eyewitness to this, really who said that I had seen this person before, really kind of ended up equivocating to that. And basically what the person said was, well, instead of having seen him like five, six times, maybe I saw him a couple times. And I was here and he was across the street. And it was dark. Now, I really didn't know him. That was that eyewitness's testimony. And so, what we have is we have these factors, okay? The counsel pointed that to me, okay? We have poor lighting conditions, it's dark. We have stress. We have a gun. We have multiracial identifications. In this case, I believe the victims may have been Hispanic and the individual was black. We have interracial identification. You got the stress, you got the gun. So basically, oh, and then we also have facial coverage, okay? All right. We have all those factors, right? And on the other hand, according to the experts, that's identification. What we have in this case is we have almost none of these factors really, unless none of these factors exist, we have stress. Any crime is going to be stressful. A crime with a gun is going to be stressful. Okay, does that mean in every case where we have a gun and a crime that we're going to have expert testimony come in that they can tell a jury, you got to be careful about the eyewitness identification. Because in this case, it wasn't dark. The assault occurred inside a room with lights on. The defendant, excuse me, the victim immediately was able to identify the defendant. Having prior acquaintance, having said he went to school with them, having known him from the streets, having purchased marijuana from the defendant on the streets, which the defendant agreed he did and told police he had done on a number of occasions, irrespective of the fact that he may not have been in a drug deal or whatever, that's beside the point. The point is, he nonetheless had close contact. So, yes, we have a stressful situation. But the victim identified and recognized the defendant right away. The victim's mom then comes in and what she does is, although she tells the individual, I know who you are, he didn't. But it got them out of the house. So, she made a photo identification. What did she do when she did her photo identification? When she did the photo identification, the photo lineup, she covered everybody's face up halfway just like they were when she saw them. That's how she made her positive identification of this defendant. Okay? So, what we have here is, we have somewhat the opposite side of Lerman. We have lighting conditions, we have inside, we have close acquaintanceship, we have sheer clear knowledge about the fact that this person knew the defendant. We have a second eyewitness who basically testifies that, yes, he had a covering, but I covered their faces in the picture to make my identification. I just didn't pick somebody out willy-nilly. So, all of these things that affect identification that the experts say make a big difference are all things that were addressed and all things that were dealt with in this case that are just the opposite that kind of indicate that the in-court identifications were proper, valid, and were sustainable. As well as the fact that all of these factors here that the experts claim affect an in-court identification were all brought out at trial by counsel. Now, the fact that counsel didn't put the pieces together and didn't offer an explanation, as counsel said here, rather than take and say, well, you can believe that this is mistaken, counsel, rather than that, basically did make it a credibility question and did take and say, I can't offer. And even if an expert had testified, could still have made the same argument. I can't offer an explanation. I don't want to take and say they're mistaken because if I'm saying they're mistaken, I'm saying they're lying and I'm not going to take and do that, whether it's good faith or not. And so, in this particular case, I don't think that the expert testimony would have shifted the balance of the evidence, would have shifted everything, especially because of the fact that it was also brought out at trial that the defendant, in talking to the police, never gave him an alibi, never said a word to him about it. As he testified on cross-examination, it slipped my mind. So basically, it's a totality of a picture type of a situation here and I don't think that questioning the identification in this testimony, in this case, would have made any difference in the ultimate verdict anyway. So for those reasons, the people of respect request that this court affirm the defendant's convictions and sentences. And if there's any questions, I'll try to answer. As long as they're not with Facebook, I'll be fine. Thank you, Mr. Hanenwick. Mr. Fischer, for rebuttal. Thank you, Your Honor. Pressing counsel's argument with respect to Issue 2, first, the identification. Counsel says, well, for example, here the witness was very certain. Interestingly, the research shows that certainty by the witness, oh, yes, that's definitely the person, that doesn't really mean anything. That doesn't make the identification any more reliable than someone who says, well, I'm not really so sure. He says, well, he knew the defendant. And yes, there was some testimony that they were acquaintances. Apparently at some time they lived in the same apartment complex. Research interestingly shows that that's not a great factor in favor of reliability either. Individuals sometimes mistake someone for someone they know. The fact that they previously knew the individual  All of these factors, you would think, would be the reverse. And that's one of the interesting things about this area. The commentators say, the researchers say, that most jurors, most people in general, have very serious misconceptions. Now, we ask the jury to use its common sense. Unfortunately, in this case, I'm not saying the jury didn't use common sense, but when we're talking about eyewitness identification, the common sense, it's almost reverse. Most people have misconceptions. Most people think, oh, well, the identity, if the witness is certain that the witness knew the person, this, that, and the other thing. The prosecutor, in closing arguments, said, oh, you can be sure that Jeremy had a laser focus on the face of the intruders. The research shows that that's just generally untrue. And so it's necessary to bring this forth to educate the jury, to allow the jury to make an informed decision. Counsel says, well, the defense brought this out. These various factors may have come out, that there was a gun, there was stress, et cetera. But there was no expert telling the jury these factors tend to undermine the reliability of identification. And again, because counsel didn't present such evidence, her argument to the jury was this is credibility, which means somebody's telling the truth and somebody's lying. And it could easily have been that the prosecution witnesses were not lying, it was a good faith misidentification. That idea was never argued to this jury. And I submit that would have strongly bolstered the alibi defense. We're not dealing with divergent defenses here. We're dealing with defenses that dovetail and make the defense all that much stronger. I'm leaving you brief, but there are other problems here with the eyewitnesses. Jeremy not only went out and bought cannabis that night, he smoked cannabis before coming back. He was beaten to the ground. There were other factors tending to undermine the reliability of the identification. And his mother had never seen the defendant before. So he generally showed her a photograph of the defendant. And then she said, oh yeah, I guess that looks like him. With respect to counsel's response to the argument on issue one, the denial of the request for the extension of the trial, I noted a phrase that counsel used prior to one of his arguments saying my conjecture is. And unfortunately, I think a lot of the state's argument about why the judge was right, about why this witness, Jamaica, would not have helped the defense. And a lot of things that the judge said about why he didn't think Jamaica was going to be great for the defense. It was all conjecture. None of those things were legal reasons that would have precluded the defense from calling the witness. The things that counsel brings up are, I don't know how impeaching they would be, but at most there are factors that the prosecutor could have used in cross-examining the witness when she testified to attempt to impeach her credibility. Now she never made any inconsistent statements. But even a witness who makes inconsistent statements, of course legally that doesn't keep them off the stand. I tried to explain that to some clients. No, you can cross-examine, you can impeach, doesn't require the jury to disregard. So none of these are reasons why the request for an extension should not have been granted. And again, it's not a situation where she was asking for days or a week or longer. She was asking until the next morning and the case went to the second day anyway. So absolutely nothing would have been lost by allowing the witness to come in. Counsel argues the witness's testimony would have been cumulative. I think, Your Honor, Justice O'Brien hit it right on the mark that while it might have been similar to the defendant and his witnesses, no, the defendant wasn't one of the intruders, but it wouldn't have been cumulative, it would have been very different because she was an occurrence witness. And that might well have carried the most weight with the trier effect. In fact, the closing argument, the prosecutor said to the jury, well, consider who the alibi witnesses are. As in most cases, you have a sister, you have a mother of his child, they're relatives, there are people close to him. And so the prosecutor, in effect, was arguing to the jury, look, they're trying to help him out. If you've got somebody who's an occurrence witness, the jury may have put much more stock in the testimony of an occurrence witness. And then the occurrence witness gave the affidavit to the prosecutor's office. That's how defense counsel found out about it. And we see so many cases where a defense witness presents an alibi and the prosecutor cross-examines and says, well, did you go to the police? No. Did you go to the prosecutor? No. And then the prosecutor argues, well, if they were really being truthful, that's what they would have done. That's what this woman did. Defendant was denied a fair trial by not being allowed to call this witness. Absolutely no good reason for the judge to deny the request for a very short extension until the next morning to allow her to testify and then allow the jury to assess her credibility as well as the credibility of all the other witnesses. And so for all of these reasons, defendant respectfully removes this request for a new trial. Time is up. Thank you. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement and a written decision will be issued to you as soon as possible. And with that, we are adjourned until January.